[Cite as *State v. Perkins*, 2025-Ohio-2390.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
WYANDOT COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,

    v.

DENNIS S. PERKINS,

      DEFENDANT-APPELLANT.

CASE NO. 16-24-11

OPINION AND
JUDGMENT ENTRY

Appeal from Wyandot County Common Pleas Court
Trial Court No. 23-CR-0109

Judgment Affirmed

Date of Decision: July 7, 2025

APPEARANCES:

    *Heather S. Kocher* for Appellant

    *Eric J. Figlewicz* for Appellee

**WALDICK, P.J.**

{¶1} Defendant-appellant, Dennis Perkins ("Perkins"), appeals the September 17, 2024 judgment of conviction and sentence entered against him in the Wyandot County Court of Common Pleas, following a jury trial in which Perkins was found guilty of Felonious Assault and Domestic Violence. For the reasons set forth below, we affirm.

*Procedural History*

{¶2} This case originated on December 13, 2023, when a Wyandot County grand jury returned a three-count indictment against Perkins, charging him as follows: Count 1 – Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(1); Count 2 – Abduction, a third-degree felony in violation of R.C. 2905.02(A)(2); and Count 3 – Domestic Violence, a fourth-degree felony in violation of R.C. 2919.25(A).

{¶3} On December 18, 2023, an arraignment was held and Perkins pled not guilty to all counts in the indictment.

{¶4} On July 1, 2024, a jury trial commenced in the case. During the course of the two-day trial, the prosecution presented the testimony of seven witnesses and introduced fourteen exhibits that were admitted in evidence. After the state rested its case, Perkins took the stand in his own defense. The defense introduced no exhibits.

{¶5} On July 2, 2024, the jury returned a verdict finding Perkins guilty on Counts 1 and 3, but not guilty on Count 2. The trial court accepted the verdicts and ordered a presentence investigation.

{¶6} On September 6, 2024, a sentencing hearing was held. At the start of that hearing, it was determined that Counts 1 and 3 were allied offenses and subject to merger for sentencing purposes, and the prosecution elected to proceed to sentencing on Count 1. The trial court then sentenced Perkins on Count 1 to an indefinite mandatory prison term consisting of a minimum of eight years up to a potential maximum of twelve years.

{¶7} On September 17, 2024, the trial court journalized its sentencing decision.

{¶8} On October 15, 2024, Perkins filed the instant appeal.

*Summary of Evidence Presented at Trial*

{¶9} Teresa L. ("Teresa"), the victim in this case, testified that she and Perkins had been married since 2022 and, in October of 2023, the couple was living together in a house located at 9344 County Highway 44, in Upper Sandusky, Ohio. Teresa testified that, in mid-October of 2023, she left their home due to tension in the marriage and went to West Virginia to visit family. After Teresa spent about a week in West Virginia, Perkins drove to West Virginia, picked up Teresa,

and brought her back to their home in Upper Sandusky. Teresa testified that, once she was back in Ohio, the couple began arguing again.

{¶10} Teresa testified that, on October 23, 2023, during an argument, Perkins accused Teresa of sleeping with another man while she had been in West Virginia. Perkins then began hitting Teresa in her face, while she begged him to stop. Perkins also kicked Teresa in the back and in the ribs, while telling her that she was evil and not of God. Teresa testified that the physical assault eventually stopped when Perkins began going through her phone, apparently looking for evidence that she had been unfaithful. While he found no such evidence, he continued to accuse her of cheating on him.

{¶11} Teresa testified that Perkins had to be at work that evening at 7:00, and he told Teresa she had to accompany him, which was something she often did. While Teresa was in a great deal of pain and could hardly move, she went with Perkins to his place of employment, where she stayed in the car while he went into work. Teresa estimated it was around 9:00 p.m. when Perkins came back out to the car during his first break, at which time she told him she could not sit in the car any longer because she was hurting so badly. Teresa asked Perkins to take her home, which he then did. Once home, Perkins assisted Teresa out of the car and carried her into the house. Teresa stayed in bed the rest of the night while Perkins went back to work to finish his twelve-hour shift.

{¶12} Teresa testified that around 7:30 the following morning, being October 24, 2023, Perkins returned home from work. During the course of that day, Perkins again began accusing Teresa of cheating on him, while also checking her phone, and calling her a liar and other derogatory names. Teresa testified that she was unable to convince Perkins that she was not cheating on him and once again the argument turned physical. Perkins hit Teresa in the head multiple times, and kicked her at least three times. Teresa testified that, at some point late that afternoon, she realized that Perkins was not going to stop and he threatened to kill her. While Perkins was distracted by going through her phone, Teresa left their house and ran to a neighboring home. While Teresa did not know the neighbors, their garage door was open and so Teresa ran through the garage door and into the neighbors' house. Inside the home, she found a teenaged boy, whom she told to call 911. The boy's mother then came into the room and called the police.

{¶13} Teresa testified that police and medics responded to the neighbors' house, and she was transported to the hospital by ambulance. At the hospital, Teresa was examined and her injuries were photographed. At trial, Teresa identified several photographs of those injuries, which included a bruise on the left side of her head, a bruise near her left eye, an injury on the right side of her head, a busted lip, bruises on her left side, a bruise on her chin, and bruises on her knees. At the hospital, Teresa was diagnosed with broken ribs. Teresa testified that it took her

ribs at least two months to heal and, even at the time of trial, her ribs would still hurt her when lying in certain positions.

{¶14} The state's next witness, Brooke Johnson, testified that she and her family live on County Road 44 in Upper Sandusky. On October 24, 2023, Johnson was working from home in her bedroom after her two teen-aged children had arrived home from school. Johnson heard the garage door slam, and then heard screaming and a women yelling "Help me, please help me." (Tr., 202). Johnson jumped up and ran into the living room, where she found an unknown woman standing there with Johnson's two teenagers. Not knowing what was going on, Johnson coaxed the woman away from the kids, and then sent the kids to their rooms, after instructing them to call their grandparents, who lived on the property in a separate residence, and telling the children to also call their father, Johnson's husband. Johnson testified that the woman, later identified as Teresa, was visibly scared and upset, with tears streaming down her face. Teresa was also holding her stomach and shaking. Teresa told Johnson to call 911, which Johnson did. Johnson locked the doors to the home and stayed on the phone with the 911 dispatcher until the police arrived.

{¶15} Deputy Tanner Smalley and Deputy Melvin Yoder, both of the Wyandot County Sheriff's Office, testified that, on October 24, 2023, at approximately 5:42 p.m., they were dispatched to the Johnson residence on County

Highway 44.  Upon arriving at that location, they observed Teresa to be scared and bruised.  After taking a brief statement from Teresa as to what had happened, and turning her over to the medics for evaluation and transport, the deputies went next door to 9344 County Highway 44, where they found Perkins standing outside near the garage.  After speaking with Perkins, the deputies placed him under arrest.

{¶16} Deputy Yoder testified as to the conversation he had with Perkins that day.  When Yoder initially asked what had happened, Perkins acted confused, indicated that nothing had happened, and stated that there had not been a confrontation.  Perkins said that Teresa had run off and he was confused as to why.  Yoder testified that, as the conversation progressed, Perkins admitted there had been a minor argument.  Perkins stated that he had told Teresa he would take her back to West Virginia, where she is from, and she then ran away.  Perkins acknowledged that he and Teresa were married.  Perkins then stated that he loves his wife and it breaks his heart when she runs off to West Virginia.  Perkins stated that he believed Teresa was involved with another man in West Virginia.

{¶17} Shileigh Ziessler, a nurse at Wyandot Memorial Hospital, assessed and cared for Teresa on October 24, 2023, after Teresa was brought into the hospital.  Ziessler testified about Teresa's demeanor that evening, and about the injuries Teresa had sustained, which included multiple bruises and a fractured rib.

{¶18} Katherine Mull, executive director of Wood County's domestic and sexual violence agency, testified as an expert witness regarding domestic violence and the ways in which abusers exert control over their victims.

{¶19} The state's final witness was Tina S. ("Tina"), Perkins' ex-wife. Tina testified that she had been married to Perkins for 28 years and that, while married to him, she was the victim of a felonious assault and abduction with which Perkins was charged, and subsequently convicted of, in Ross County, Ohio. She identified Perkins as being the same Dennis Perkins referenced in the judgment entry of sentencing from that Ross County case.

{¶20} After the prosecution rested its case, the defense opted to put on evidence and Perkins took the stand. Perkins acknowledged that he was married to Teresa and that, in October of 2023, they had been living together at 9344 County Road 44. Perkins testified that on October 12, 2023, Teresa went to work at her job in Findlay but then never came home. When Perkins woke up the next morning at home and discovered Teresa was not there, he made some phone calls and found out that Teresa had obtained a ride to Chillicothe and then taken a bus to West Virginia, where she is from. Teresa stayed in West Virginia until approximately October 21, 2023, when she called Perkins to say she wanted to come home. Perkins borrowed a car and drove to West Virginia to pick up Teresa. Perkins testified that when he got there, Teresa came out of her aunt's house holding her ribs and

appearing as if she was hurt. Perkins testified that once Teresa got into the car, he also noticed bruises on the left side of her face and head. He and Teresa then drove back to Upper Sandusky.

**{¶21}** Perkins testified that on October 23, 2023, he and Teresa spent the day together at home, as he was scheduled to work that night. Teresa then went with him that evening when he left for work. Perkins testified that they picked up food at Wendy's, drove to his place of employment, and ate in the car while parked in the parking lot. Perkins then went inside to start his shift. Perkins testified that he took his first break at around 9:30 that night and checked in on Teresa, who had remained in the car. At that time, Teresa asked to go home, and so Perkins took her home and then he returned to work. Perkins testified that he worked until 7:30 the next morning, and then went home.

**{¶22}** Perkins testified that on October 24, 2023, he and Teresa drank coffee and did a few chores around the house in the morning after he arrived home from work. Later that morning, Perkins went to sleep. Perkins testified that, when he woke up around 3:00 that afternoon, he told Teresa that he wanted her to take a drug test to prove that she had not used drugs while in West Virginia. Perkins testified that Teresa refused, and so he told her to pack her things because he was going to take her back to West Virginia. Perkins testified that Teresa then jumped up and ran to the neighbors' house. Perkins testified that he did not follow Teresa and that

he was standing by his truck in the driveway when the police showed up. Perkins said that the officer asked what was going on, and so Perkins told him what had happened. Perkins testified that he told the officer he loves Teresa but they had a little argument and she took off and ran across the yard. Perkins testified that he told the officer that Teresa's son usually abuses her when she is in West Virginia.

**Assignment of Error**

**Did the trial court err by not instructing the jury on the lesser offense of aggravated assault?**

{¶23} In the sole assignment of error, Perkins argues that, as to Count 1, the trial court erred in failing to instruct the jury as to an inferior degree offense.

{¶24} A trial court has discretion in determining whether sufficient evidence was presented at trial to require a particular instruction. *State v. Lessin*, 67 Ohio St.3d 487, 494 (1993), citing *State v. Wolons*, 44 Ohio St.3d 64 (1989), paragraph two of the syllabus. Abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶25} In the instant case, Perkins was charged in Count 1 with Felonious Assault in violation of R.C. 2903.11(A)(1), which provides in relevant part that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]"

{¶26} Perkins asserts on appeal that the trial court erred in not also providing the jury with an instruction on Aggravated Assault as to Count 1.

**{¶27}** Aggravated Assault, which is defined in R.C. 2903.12, is an "inferior degree" offense of Felonious Assault, meaning that the two offenses are identical except for the "additional mitigating element of serious provocation" in the definition of the aggravated assault offense. *State v. Deem*, 40 Ohio St.3d 205, 210–11 (1988). As relevant to the instant case, the mitigating factor in the offense of Aggravated Assault requires proof that the offender knowingly caused serious physical harm to another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.12(A)(1).

**{¶28}** A trial court must engage in a two-part inquiry to determine whether the evidence was sufficient to warrant a jury instruction on Aggravated Assault. *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). "First, an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage." *Id*. "That is, the provocation must be 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" *Id*., quoting *State v. Shane*, 63 Ohio St.3d 630, 635. If that objective standard is met, the second part of the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "'actually was under the influence of sudden passion or in a sudden fit of rage.'" *Id*.

-11-

{¶29} In the case before us, Perkins argues that the trial court erred by not instructing the jury on the inferior degree offense of Aggravated Assault when there was sufficient evidence of serious provocation to warrant the additional instruction. Specifically, Perkins asserts that evidence he acted in a violent manner as a result of believing his wife was cheating on him constitutes sufficient evidence that he acted under a sudden fit of rage or passion brought about by serious provocation on his wife's part, which was reasonably sufficient to incite him into using deadly force.

{¶30} We begin our analysis by noting that Perkins did not object to the jury instructions that were given by the trial court, nor did Perkins request an instruction on Aggravated Assault. At trial, after the evidence was in but prior to closing arguments, the trial court and counsel discussed the issue of jury instructions on the record, outside the presence of the jury. At that time, the trial court noted that a draft of proposed instructions had just been reviewed by the court and counsel. The trial court then noted that it was the court's understanding that the defense was satisfied with no lesser included offenses in the jury instructions, and defense counsel confirmed that was correct. The trial court then stated, "And you're not asking for any lesser included offenses at this time?", to which defense counsel responded, "No, Your Honor." (Tr., 399). After counsel for both parties acknowledged they were satisfied with the proposed instructions, the jury was

returned to the courtroom for closing arguments. Following closing arguments by counsel, the trial court then instructed the jury as to the three charges contained in the indictment: Felonious Assault, Abduction, and Domestic Violence.

{¶31} "Absent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal." *State v. Underwood,* 3 Ohio St.3d 12, 13 (1983), citing *State v. Williams*, 51 Ohio St.2d 112 (1977); *State v. Humphries*, 51 Ohio St.2d 95 (1977). As a result, "[t]he failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *Underwood*, at syllabus. To establish plain error under Crim.R. 52(B), the party asserting error must demonstrate that an error occurred, that the error was plain, and that the error affected his substantial rights. *State v. Bond*, 2022-Ohio-4150, ¶ 17.

{¶32} More importantly, even construing the evidence most liberally in Perkins' favor, the record in the instant case is simply insufficient to establish the serious provocation necessary to require an instruction on Aggravated Assault. At best, the evidence established an unsubstantiated belief on Perkins' part that his wife had been unfaithful at some time well prior to the occurrence of the felonious assault at issue. Such a belief is not, as a matter of law, sufficient provocation occasioned by the victim reasonably sufficient to incite Perkins into using deadly force, as required to establish the elements of Aggravated Assault in violation of R.C.

2903.12(A)(1). *E.g. State v. Shane*, 63 Ohio St.3d 630 (1992) (holding that a fiancee's confession of adultery is not reasonably sufficient provocation to transform the murder of the fiancee into voluntary manslaughter, and therefore no jury instruction on the inferior-degree offense was required); *State v. McKinnon*, 2017-Ohio-5784, ¶ 26 (7th Dist.) (concluding that the victim telling the defendant she had lied, stolen his money, cheated on him, and then grabbed him by the testicles was not sufficient provocation to cause an ordinary person to beat someone to the point of serious physical harm); *State v. Cayson*, 2006-Ohio-2011, ¶26 (11th Dist.) (holding that simple awareness by one party to a relationship of the existence of a sexual relationship between the other party and a third person is insufficient, of itself, to establish serious provocation); *State v. Dixon*, 2004-Ohio 3374, ¶ 14 (10th Dist.) (holding that a spouse's confession of adultery is not reasonably sufficient provocation to transform a felonious assault into the inferior offense of aggravated assault).

**{¶33}** In this case, the overall evidence at trial established that Perkins, of his own accord, became obsessed with the victim's alleged infidelity, with no apparent provocation by the victim, and with no evidence of the suspected infidelity. Moreover, Perkins' own testimony at trial offered no support for an Aggravated Assault instruction, as his testimony suggested that he did not cause Teresa's injuries but, rather, that she had sustained them during her visit to West Virginia,

possibly at the hands of her son. Thus, an instruction on Aggravated Assault would have been incompatible with the defense theory of actual innocence.

{¶34} In summary, on the facts of this case, the trial court did not abuse its discretion in failing to instruct the jury on Aggravated Assault, and the trial court's failure to do so certainly did not amount to plain error.

{¶35} The assignment of error is overruled.

*Conclusion*

{¶36} Having found no error prejudicial to the defendant-appellant, Dennis Perkins, in the particulars assigned and argued, the judgment of the Wyandot County Court of Common Pleas is affirmed.

***Judgment affirmed***

**MILLER and WILLAMOWSKI, J.J., concur.**

Case No. 16-24-11

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignment of error is overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

 

Juergen A. Waldick, Judge

 

Mark C. Miller, Judge

 

John R. Willamowski, Judge

DATED:
/jlm